RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0233p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SUSAN ALLAN; JESSICA WILSON,

*Plaintiffs-Appellees*,

*v.*

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, dba American Education Services,

*Defendant-Appellant*.

⎤
⎟
⎟
⎟
⎬  No. 19-2043
⎟
⎟
⎟
⎦

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:14-cv-00054—Gordon J. Quist, District Judge.

Argued: April 28, 2020

Decided and Filed: July 29, 2020

Before: SILER, MOORE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Sandra Jasinski, BODMAN PLC, Detroit, Michigan, for Appellant. Adam T. Hill, THE LAW OFFICES OF JEFFREY LOHMAN, P.C., Corona, California, for Appellees. **ON BRIEF:** Sandra Jasinski, Marc M. Bakst, Donovan S. Asmar, BODMAN PLC, Detroit, Michigan, for Appellant. Adam T. Hill, THE LAW OFFICES OF JEFFREY LOHMAN, P.C., Corona, California, for Appellees. Tara Twomey, NATIONAL CONSUMER LAW CENTER, Boston, Massachusetts, for Amici Curiae.

MOORE, J., delivered the opinion of the court in which SILER, J., joined. NALBANDIAN, J. (pp. 19–22), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.    Jessica Wilson and Susan Allan (collectively, "Plaintiffs") received unwanted calls to their cell phones from Pennsylvania Higher Education Assistance Agency ("PHEAA") regarding their student-loan debt.  They claim that those calls violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA").  The TCPA contains an autodialer ban, which generally makes it a finable offense to use an automatic telephone dialing system ("ATDS") to make unconsented-to calls or texts.[1]  The question in this case is whether, as a matter of statutory interpretation, the Avaya autodialer system that PHEAA uses to make collection-related calls qualifies as an ATDS.

Although it is clear from the text of the autodialer definition under § 227(a) that a device that generates and dials random or sequential numbers qualifies as an ATDS, it is not clear whether a device like the Avaya system—that dials from a stored list of numbers only—qualifies as an ATDS.  Fortunately, related provisions clear up any ambiguity.  We hold that the plain text of § 227, read in its entirety, makes clear that devices that dial from a stored list of numbers are subject to the autodialer ban.  We accordingly **AFFIRM** the district court's grant of summary judgment for Plaintiffs.

**I.  BACKGROUND**

Jessica Wilson, with the help of co-signer Susan Allan, took out a student loan serviced by PHEAA.  At one point in time, Wilson and Allan had submitted a written request for forbearance on the loan and, in doing so, consented to calls to their cell phones.  On October 4, 2013, however, Wilson requested that PHEAA stop calling her about her loan.  R. 30 (Pl.'s Ex. B-3, Def.'s Resp. to Req. for Admis.) (Page ID #231).  Allan did the same on October 15, 2013. *Id.*  Despite their requests, PHEAA called Allan 219 times and Wilson 134 times, after they revoked consent, for a total of 353 unconsented-to calls.  R. 31 (Pl.'s Ex. F-1) (Page ID #267); R. 32 (Pl.'s Ex. F-2) (Page ID #282); *see also* R. 46 (Order Granting Summ. J. at 6–7) (Page ID

---

[1]Text messages are covered by the TCPA. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016).

#402–03) (noting that "PHEAA has offered no evidence to contradict those figures"). The calls were made on a near-daily basis, often multiple times per day. R. 31 (Pl.'s Ex. F-1) (Page ID #267); R. 32 (Pl.'s Ex. F-2) (Page ID #282). In connection with at least thirty of these calls, PHEAA left automated voice messages on Allan's cell phone, asking her to return its call. R. 33 (Pl.'s Ex. G, Allan Aff. at 1–3) (Page ID #297–99); *see also* R. 28-2 (Pl.'s Ex. B-1) (Page ID #144) (describing the Avaya automated voice messaging system).

The calls placed to Wilson's and Allan's cell phones were automated. PHEAA uses the Avaya Proactive Contact system to create calling lists and to place calls with a pre-recorded, artificial voice. *See* R. 37-2 (Def.'s Ex. 2, Krobath Decl. at 3) (Page ID #333). The calling list "is created daily by an automated batch process that determines what subset of accountholders qualifies for telephonic contact that day, based on, among other things, amounts owed, delinquency status and prior contacts." *Id.* In other words, the Avaya system creates a calling list based on a stored list of numbers—the numbers are "not randomly generated." *Id.* A live person then "create[s] the calling campaigns for the day." *Id.* But it is the Avaya dialing system that actually "places the calls and connects [call recipients] to operators when a voice is detected." *Id.* This type of automated-calling device is called a "predictive dialer." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd 14014, 14091, ¶ 131 (defining a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls").

Wilson and Allan brought this suit against PHEAA alleging that the unconsented-to calls violate the TCPA. R. 1 (Compl.) (Page ID #1). After conducting discovery, Plaintiffs moved for summary judgment on April 1, 2019. R. 28 (Mot. for Summ. J.) (Page ID #73). The district court granted their motion and entered judgment in their favor on August 19, 2019, and awarded them damages in the amount of $176,500. R. 46 (Order Granting Summ. J.) (Page ID #397); R. 47 (Judgment) (Page ID #405). We have jurisdiction over PHEAA's timely appeal. *See* 28 U.S.C. § 1291.

## II.  DISCUSSION

We review de novo the district court's decision to grant summary judgment.  *See Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008).  "A grant of summary judgment will be upheld only where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law."  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered."  *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005).  Where the moving party has the burden of proof, her "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quotation omitted).  There are no genuine disputes of material fact in this case.

Plaintiffs succeeded in moving for summary judgment below.  The two issues on appeal are whether the Avaya system that PHEAA uses to make debt-collection calls qualifies as an ATDS under the TCPA, and whether it was proper for the district court to consider evidence of the thirty voicemails that PHEAA left on Allan's cell phone.  We affirm the district court on both counts.[2]

## A.  Interpreting ATDS

The TCPA autodialer ban generally makes it a finable offense to use an automatic telephone dialing system, or "ATDS," to make unconsented-to calls or texts.  47 U.S.C. § 227(b)(1).  In the same section, the TCPA defines ATDS as "equipment which has the capacity–(A) to store or produce telephone numbers to be called, using a random or sequential

---

[2]PHEAA also claims that the Avaya system requires some human intervention, but does not make any legal arguments on that point.

number generator; and (B) to dial such numbers." § 227(a). That definition is at issue on this appeal. How to define ATDS has split the circuits.

The Avaya autodialer system that PHEAA uses to make collection-related calls dials from a stored list of numbers. It does not randomly or sequentially generate numbers to dial. Whether autodialer devices like the Avaya system are covered by the TCPA is the source of the circuit split. The Ninth Circuit was the first to weigh in and held that stored-number systems are covered under the TCPA. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018) (Ikuta, J.). The Second Circuit likewise concluded that stored-number systems are covered. *See Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 2020 WL 1682773 (2d Cir. Apr. 7, 2020) (Cabranes, J.). The Seventh and Eleventh Circuits have gone the other way. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020) (Barrett, J.); *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1304–05 (11th Cir. 2020) (Sutton, J., visiting).[3]

At the outset, we cannot look to Federal Communications Commission ("FCC") orders for guidance on this interpretive question because the D.C. Circuit invalidated the FCC's interpretation of ATDS in *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 700 (D.C. Cir. 2018). *See Marks*, 904 F.3d at 1049; *Glasser*, 948 F.3d at 1310; *Gadelhak*, 950 F.3d at 463. *But see Duran*, 955 F.3d 279 (holding that pre-2015 FCC orders "survived" *ACA International* "and continue to inform [its] interpretation of the TCPA today"). Previously, FCC orders permitted two, contradictory interpretations of ATDS: (1) a device qualifies as an ATDS "only if it can generate random or sequential numbers to be dialed" and (2) a device qualifies as an ATDS "even if it lacks that capacity" to generate numbers. *ACA Int'l*, 885 F.3d at 702. "It might be permissible," the D.C. Circuit reasoned, "for the Commission to adopt either interpretation," "[b]ut the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id.* at 703. Plaintiffs argue that this holding pertains only to the 2015 FCC order that was being litigated in *ACA International*, but the D.C.

---

[3]We have not addressed this question in a published decision and decline to adopt our reasoning in *Gary v. TrueBlue, Inc.*, 786 F. App'x 555 (6th Cir. 2019) (order). The Third Circuit has not expressly addressed this question, but it did assume (without providing any analysis) that an ATDS must use a random or sequential number generator. *See Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018).

Circuit was clear that its holding applied to the FCC's earlier orders as well.  *Id.* at 701.  Either interpretation is fair game now.

### 1.  Ambiguity in the Autodialer Definition

"In determining the meaning of a statutory provision, we look first to its language, giving the words used their ordinary meaning."  *In re Application to Obtain Discovery for Use in Foreign Proceedings*, 939 F.3d 710, 717 (6th Cir. 2019) (quoting *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018)).  To do so, we "look[] at the language and design of the statute as a whole."  *Id.* at 718.

The TCPA defines ATDS as "equipment which has the capacity—

  (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

  (B) to dial such numbers."

47 U.S.C. § 227(a)(1).  Courts have tried to fashion a plain text reading from these words, but each reading has its problems, as every circuit to consider this question admits.

First, the phrase "using a random or sequential number generator" could apply both to "store" and "produce," like so:

An ATDS is "equipment which has the capacity—

  (A) to store [telephone numbers to be called, using a random or sequential number generator];

     or produce telephone numbers to be called, using a random or sequential number generator; and

  (B) to dial such numbers."

§ 227(a)(1).  Under this definition, the Avaya system would not qualify as an ATDS because it does not store numbers by using a random or sequential number generator.  The Avaya system instead stores numbers using some other type of device.

The advantage of this reading is that it follows proper grammar—here, the last antecedent rule.  When a clause is set off by a comma at the end of a sentence, it should modify all that precedes it.  *See Gadelhak*, 950 F.3d at 468 ("[A] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of

only to the immediately preceding one." (quoting WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67–68 (2016))).

The problem with this reading is that it requires a strained reading of "store." "[I]t is hard to see how a number *generator* could be used to 'store' telephone numbers," even if it can "as a technical matter." *Id.* at 464 (emphasis added) (citation omitted). Because a number generator *produces* numbers, the more natural reading is that "using a random or sequential number generator" solely modifies "produce." "As a matter of ordinary usage it's hard to say that the random number generator is 'storing' in any notable way." *Id.* at 464–65 (quotation omitted). We will not apply the last antecedent rule "in a mechanical way where it would require accepting 'unlikely premises.'" *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (quotation omitted). The last antecedent rule "is 'not an absolute and can assuredly be overcome by other indicia of meaning.'" *Id.* (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). There are other indicia of meaning in § 227(b), as will be explained below. *See infra* at 10–12.

This reading also renders "store" superfluous. "Common sense suggests that any number that is stored using a number-generator is also *produced* by the same number-generator; otherwise, it is not clear what 'storing' using a number-generator could mean." *See Duran*, 955 F.3d 279. Even if a random or sequential number generator *can* store numbers, its storage function, if any, is incidental to its production function. "It is our duty 'to give effect, if possible, to every clause and word of a statute . . . . We are thus 'reluctan[t] to treat statutory terms as surplusage' in any setting." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quotations omitted). True, Congress sometimes will use the "belt-and-suspenders" approach to avoid loopholes. But here, we risk creating a loophole if we were to follow the Seventh and Eleventh Circuits' narrow interpretation of "store." If stored-number systems are not covered, companies could avoid the autodialer ban altogether by transferring numbers from the number generator to a separate storage device and then dialing from that separate storage device. The autodialer ban would not apply to them because, technically, they are not *using* the random or sequential number generator to store and dial the numbers.

We conclude that this plain text reading of the autodialer definition is too labored and problematic to carry the day.

The second option is that the phrase "using a random or sequential number generator" could apply to "produce" only, like so:

An ATDS is "equipment which has the capacity—

(A) to store [telephone numbers to be called];

or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers."

§ 227(a)(1).  Under this reading, the Avaya system that PHEAA uses would qualify as an ATDS because it stores numbers and dials those numbers.

The advantage to this reading is that it avoids the awkwardness and surplusage of the first reading.  But there is a new problem.  "To store," a transitive verb, lacks a direct object.  Thus, this reading requires adding the phrase "telephone numbers to be called" after "store" for it to make grammatical sense.  This is a significant modification.  And as stated above, this reading violates the last antecedent rule.  We conclude that the second plain text reading of the autodialer definition is, by itself, unworkable, too.[4]

The dissent offers a third reading in which "using a random or sequential number generator" modifies the phrase "telephone numbers to be called."  We agree that the dissent's reading, like the first reading, follows proper grammar.  However, like the first reading, the dissent's reading still requires a strained reading of "store."  Even if "using a random or sequential number generator" modifies a truncated version of the phrase that precedes it, it still makes little sense why the statute would require stored numbers to be called using a random or sequential number generator.  Moreover, it is the dissent's reading that introduces superfluity into the statute.  If the goal of the statute is to regulate devices that randomly or sequentially generate numbers, then the autodialer definition simply could include devices that produce those numbers, without mentioning devices that store those numbers.  On the flipside, modifying "produce" with "using a random or sequential number generator" meaningfully differentiates "produce" from "store."  Whereas it would be strange to store numbers using a number

---

[4]There are other proposed interpretations that are substantively the same as those discussed here or are inferior options.  *See Gadelhak*, 950 F.3d at 463–68.

generator, "produce," on its own, easily could mean numbers produced from a stored list. At day's end, the dissent's proposed reading is not so different from the first reading and does not open up a new interpretive avenue not previously analyzed by this court or other circuits.

The Seventh and Eleventh Circuits decided that the first reading, though "imperfect," was the better option from a textual perspective. *Gadelhak*, 950 F.3d at 468; *Glasser*, 948 F.3d at 1306. "Clarity," the Eleventh Circuit "lament[ed], does not leap off this page of the U.S. Code. Each interpretation runs into hurdles." *Glasser*, 948 F.3d at 1306. The Seventh Circuit conceded that "the comma seems to be ungrammatical under any interpretation" and that "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *Gadelhak*, 950 F.3d at 468 (quotation omitted). Nevertheless, the Seventh Circuit concluded, the first reading "lacks the more significant problems of the other three interpretations and is thus our best reading of a thorny statutory provision." *Id.* In addition to the text, the Seventh and Eleventh Circuits considered the administrative and legislative history of the TCPA and the practical effects of a more expansive interpretation of ATDS. *See Glasser*, 948 F.3d at 1308–11; *Gadelhak*, 950 F.3d at 467.

The Second and Ninth Circuits rejected the interpretation of ATDS adopted by the Seventh and Eleventh Circuits. "After struggling with the statutory language," the Ninth Circuit concluded that the autodialer definition, viewed in isolation, was "ambiguous on its face" and went on to examine the structure and context of the autodialer ban as a whole. *Marks*, 904 F.3d at 1051.

We agree with the Ninth Circuit's assessment and approach. In doing so, we note, as the Ninth Circuit did, that the D.C. Circuit already decided that the definition of ATDS is open to more than one reasonable interpretation. *See id*; *ACA Int'l*, 885 F.3d at 703 (holding that it was permissible for the FCC to interpret the autodialer ban as applying (1) to devices that use a random or sequential number generator or (2) devices that do not—just not both). Because the definition of ATDS itself is ambiguous, we look to other provisions of the autodialer ban to guide us in our interpretation.

## 2. The Larger Context of the Autodialer Ban

Here, again, we agree with the Second and Ninth Circuits that the structure and context of the autodialer ban support an interpretation of ATDS that would cover stored-number systems like the Avaya system in this case. *See Duran*, 955 F.3d 279; *Marks*, 904 F.3d at 1051–52.[5] Whatever Congress's purpose may have been at the time of enactment, "language in the statute indicates that equipment that made automatic calls from lists of recipients [is] also covered by the TCPA." *Marks*, 904 F.3d at 1051. One exception to the autodialer ban, found in the same section of the TCPA as the autodialer definition, shores up any ambiguity.

The TCPA's autodialer ban contains an exception for calls "made with the prior express consent of the called party." § 227(b)(1)(A). Consenting recipients are known persons whose numbers are stored on a list. *See Marks*, 904 F.3d at 1051; *Glasser*, 948 F.3d at 1316 (Martin, J., concurring in part and dissenting in part). In order to give their express consent prior to receiving a call, they must give their number to the entity making the call. Thus, the entity making the automated call is dialing a stored number—not a number that it randomly generated. The consent exception is key to defining ATDS because an exception cannot exist without a rule. An exception for consented-to calls implies that the autodialer ban otherwise could be interpreted to prohibit consented-to calls. And consented-to calls by their nature are calls made to known persons, i.e., persons whose numbers are stored on a list and were not randomly generated. Therefore, the TCPA's exception for calls made to known, consenting recipients implies that the autodialer ban applies to stored-number systems.

Under the Seventh and Eleventh Circuits' interpretation of "store," the numbers to be dialed must have been randomly generated at some point. But as the consent exception makes clear, the autodialer ban covers calls made to known recipients—in other words, people whose numbers are known and are stored on a list. Calls made from a stored list of numbers accordingly are subject to the autodialer ban.

---

[5]The Ninth Circuit also suggested that Congress ratified the FCC's definition of ATDS as including devices that dial from a stored list of numbers when it amended other autodialer provisions without modifying the provision at issue here. *See Marks*, 904 F.3d at 1052. As the Eleventh Circuit points out, "That is an odd thing to say about a reading of the statute that the D.C. Circuit described as '[in]consistent with reasoned decisionmaking.'" *Glasser*, 948 F.3d at 1310.

To combat this reading, the Eleventh Circuit suggests that the consent exception simply does not apply to automated calls. It notes, for this point, that the TCPA regulates not just automated calls, but also calls using a prerecorded or artificial voice. *See Glasser*, 948 F.3d at 1311–12. The Eleventh Circuit speculates that it was *those* prerecorded or artificial voice calls that Congress sought to permit with the consent exception. *See id.* "But," as the Second Circuit observed, "the language of the statute does not make that distinction." *Duran*, 955 F.3d 279 n.20. There is no basis at all in the text of the statute for the Eleventh Circuit's bald assertion that the consent exception does not apply to automated calls.[6]

We additionally note that the autodialer ban was amended in 2015 to permit collection calls "made solely pursuant to the collection of a debt owed to or guaranteed by the United States." § 227(b)(1)(A)(iii). The Supreme Court recently struck that exception because it "impermissibly favored [government-]debt-collection speech over political and other speech, in violation of the First Amendment." *See Barr v. Am. Ass'n of Political Consultants, Inc.*, – S. Ct. –, 2020 WL 3633780, at *2 (July 6, 2020) ("*AAPC*") (Kavanaugh, J.). The Court severed that provision from the remainder of the autodialer ban, so that political automated calls would be "treated equally with debt-collection speech." *Id.*

Prior to the Court's decision in *AAPC*, the Second and Ninth Circuits reasoned that an exception to the autodialer ban for government-debt collectors implies that the TCPA prohibits automated collection calls made to collect on private debts. *See Marks*, 904 F.3d at 1051–52; *Duran*, 955 F.3d at 285. Like consented-to calls, calls made to collect on a debt are calls made to known recipients. *See Marks*, 904 F.3d at 1052. These calls are dialed from a stored list of numbers because the debt-collection industry uses known numbers, not random numbers. *See* Appellant Br. at 5 ("Obviously, a loan servicer like PHEAA would have no interest in randomly calling borrowers."). They are targeting known persons to collect on their debts. "[T]he only way this exception [for calls made by government-debt collectors] makes sense is if an ATDS

---

[6]Additionally, "the FCC, when promulgating new rules to explain the debt-collection exception, specifically noted that the 'exception . . . allows the use of an *autodialer*, prerecorded-voice, and artificial-voice when making calls[,]' not just prerecorded- or artificial-voice as the Eleventh Circuit suggests." *Duran*, 955 F.3d 279 n.20 (quoting *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 FCC Rcd. 9074, 9116 (2016) (emphasis added)).

can make calls or texts using a human-generated list of phone numbers." *Duran*, 955 F.3d at 285. The now-defunct government-debt-collection exception implies that the autodialer ban covers stored-number systems.[7]

We see no reason to strain the text of the autodialer definition itself when related provisions inform its meaning. "[I]f an examination of the statute's text, context, and structure produces an answer to our interpretation question, we need inquire no further." *In re Application to Obtain Discovery*, 939 F.3d at 718. We therefore are not persuaded by the Seventh and Eleventh Circuits' analysis of the administrative and legislative history of § 227 and the purported practical effects of our interpretation.

### 3. Administrative History, Legislative History, and Practical Effects

Resort to other interpretive tools, in any case, does not change our outcome. The Eleventh Circuit makes use of the FCC's administrative history and points out that, from 1991 to 2003, the FCC defined an ATDS as a device that uses a random or sequential number generator. *Glasser*, 948 F.3d at 1308. Then the FCC issued a series of orders from 2003 to 2015 expanding the definition to cover devices that dial from a stored list without using a random or sequential number generator. The Eleventh Circuit calls this shift an attempt "to pour new wine into . . . old skin." *Id.* at 1308. In its view, the FCC's "efforts to fill a legislative gap" went too far. *Id.* at 1308–09. As for legislative history, the Eleventh Circuit stated that "the be-all and end-all of the law" merely was to "eradicate machines that dialed randomly or sequentially generated numbers." *Id.* at 1311.

---

[7]The Supreme Court's decision in *AAPC* additionally suggests that the autodialer ban applies to debt collectors like PHEAA. In striking down the government-debt-collection exception, the Court remarked that, prior to the 2015 amendment, "the TCPA prohibited almost all robocalls to cell phones." *AAPC*, 2020 WL 3633780, at *3 (Kavanaugh, J.). "The government-debt exception [wa]s a relatively narrow exception to the broad robocall restriction." *Id.* at *12. In nullifying that exception, the plurality acknowledged that its ruling would "eliminat[e] favorable treatment for debt collectors," a concern raised by Justice Gorsuch in dissent. *Id.* at *13. Justice Sotomayor stated in concurrence that the government-debt-collection exception could not pass even intermediate scrutiny because the Government "has not explained how a debt-collection robocall about a government-backed debt is any less intrusive or could be any less harassing than a debt-collection robocall about a privately backed debt." *Id.* at *14 (Sotomayor, J., concurring). Thus, "the government-debt exception is seriously underinclusive because it permits many of the intrusive calls that the automated call ban was enacted to prohibit." *Id.* (quotation omitted). It appears, then, to be taken for granted by at least some members of the Court that the autodialer ban applies to private debt collectors like PHEAA.

It may well be that Big Data was not at the forefront of the minds of Congress members and FCC officials crafting and interpreting the TCPA. But Congress did not explain the purpose of the autodialer ban so narrowly, and apparently, by the year 2003, the FCC thought that a broad interpretation of "store" was defensible. Congress enacted the TCPA in 1991 to combat pervasive telemarketing. *See ACA Int'l*, 885 F.3d at 692 (quoting 47 U.S.C. § 227 note, Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394). Telemarketing widely was viewed as "intrusive" and a "nuisance." *Id.* (quoting 47 U.S.C. § 227 note, Pub. L. No. 102-243, § 2(6)–(7), 105 Stat. 2394, 2394). "[O]ver 300,000 telemarketing solicitors call[ed] more than 18 million Americans every day," *Marks*, 904 F.3d at 1043 (quoting 137 Cong. Rec. S16,971 (daily ed. June 27, 1991) (statement of Rep. Pressler)), and "a single autodialer could cause as many as 1,000 phones to ring and then deliver a prerecorded message to each," *id.* (citing H.R. Rep. No. 102-317, at 10 (1991)).

"A leading Senate sponsor of the TCPA captured the zeitgeist in 1991, describing robocalls as 'the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall.'" *AAPC*, 2020 WL 3633780, at *3 (Kavanaugh, J.) (quoting 137 Cong. Rec. 30821 (1991)). It is clear from the legislative history that Congress intended to crack down on automated calls themselves—not just the technology making them possible at the time. The multiple debt-collection calls made to Wilson and Allan on a near-daily basis in this case certainly are the sort of harm contemplated at the time of enactment and, indeed, are the type of calls that "consumers appear to find *most* invasive." *See id.* at *21 (Gorsuch, J., concurring in part and dissenting in part).

Nevertheless, to make its case that the legislative and administrative history is in its favor, the Eleventh Circuit observes that "devices that randomly generated phone numbers and stored them existed at the time Congress passed the Act." *Glasser*, 948 F.3d at 1307 (citing *Noble Systems Corp., Comments on FCC's Request for Comments on the Interpretation of the TCPA*, 12–13 (Oct. 16, 2018) FCC DA 18-493); *see also Gadelhak*, 950 F.3d at 465 ("[S]ome systems 'store' randomly generated numbers for much longer than a few fleeting moments. The record before the FCC reveals that at the time of the statute's enactment, devices existed with the

capacity to generate random numbers and then store them in a file for a significant time before selecting them for dialing."). It cites, for this statement, a comment made by a single company as its contribution to the process of FCC rule-making. Even if this lone comment were compelling evidence that Congress knew of dual-function devices, "store" still would be redundant of "produce." *See supra* at 7–9. This evidence leaves open the possibility that Congress intended to regulate (1) number-producing devices, (2) number-storing devices, and (3) dual-function devices.

Next, the Eleventh Circuit reasons that the more expansive interpretation of "store" would apply to nearly any device with storage capabilities, rendering "using a random or sequential number generator" an unnecessary add-on in most cases. *Glasser*, 948 F.3d at 1307. Yet, to the extent that this is true, it is true only today. It obviously was not true at the time of enactment. Just because the primary enforcement mechanism at the time of enactment goes dormant decades after the fact does not mean that it is mere surplusage as a textual matter. And even then, "dormant" would be a strong word, as companies may continue to make use of random or sequential number generators in mass-dialing campaigns. "When a new application emerges that is both unexpected and important, [the Eleventh Circuit] would seemingly have us . . . decline to enforce the plain terms of the law . . . . That is exactly the sort of reasoning [the Supreme] Court has long rejected." *Bostock v. Clayton County*, – S. Ct. –, 2020 WL 3146686, at *15 (June 15, 2020).

Finally, the Eleventh Circuit expresses concern that the more expansive interpretation of "store" would capture everyday use of smart phones. *Glasser*, 948 F.3d at 1309. "In the age of smartphones, it's hard to think of a phone that does not have the capacity to automatically dial telephone numbers stored in a list, giving § 227 an 'eye-popping' sweep. Suddenly an unsolicited call using voice activated software (think Siri, Cortana, Alexa) or an automatic 'I'm driving' text message could be a violation worth $500." *Id.* (citation omitted). The Seventh Circuit agreed, stating that the more expansive interpretation "would create liability for every text message sent from an iPhone." *Gadelhak*, 950 F.3d at 467. The purported "far-reaching consequences" appear to have been a big sticking point for the Seventh Circuit:

> [The more expansive interpretation of "store" would create] a sweeping restriction on private consumer conduct that is inconsistent with the statute's narrower focus. Gadelhak argues that to qualify as an "automatic telephone dialing system" a device need only have the "capacity ... to store ... telephone numbers" and then to call or text them automatically. Every iPhone today has that capacity right out of the box. An iPhone of course can store telephone numbers; it can also send text messages automatically, for example by using the "Do Not Disturb While Driving" function. Every iPhone, then, has the necessary capacities to meet the statutory definition. That means that under Gadelhak's interpretation, every call or text message sent from an iPhone without the prior express consent of the recipient could subject the sender to a $500 fine.

*Id.* (quotations omitted).

The concern that everyday use of smart phones would become subject to a fine is unfounded. The D.C. Circuit already dealt with this concern in *ACA International* when it rejected the FCC's interpretation of "capacity" in § 227(a)(1). 885 F.3d at 692. As a reminder, an ATDS is "equipment which has the *capacity*" to store or produce numbers and to dial such numbers. § 227(a)(1) (emphasis added). The FCC had "construed a device's 'capacity' to encompass its '*potential* functionalities' with modifications such as software changes." *ACA Int'l*, 885 F.3d at 693–94 (quoting 2015 Declaratory Ruling, 30 FCC Rcd. at 7974 ¶ 16) (emphasis added). The D.C. Circuit set that definition aside. *Id.* at 692. "It [wa]s undisputed that," under the FCC's interpretation of "capacity," "essentially *any smartphone*, with the addition of software, c[ould] gain the statutorily enumerated features of an autodialer and thus function as an ATDS." *Id.* at 696 (emphasis added). To prevent this outcome, the D.C. Circuit rejected the FCC's interpretation of "capacity" as "unreasonably, and impermissibly, expansive." *Id.* at 700. Thus, the D.C. Circuit held that a device is an ATDS only if it actually is used in the way prescribed by statute. *Id.* That means that use of a cell phone would be subject to a fine under the TCPA only if it *actually* is used as an ATDS.

To that end, the autodialer ban applies to *automatic* dialing systems or artificial or prerecorded voice messages only. *See* § 227(b) (titled "[r]estrictions on use of *automated* telephone equipment" (emphasis added)). It is an "accepted assumption that auto-dialers must *automatically* dial the numbers." *Glasser*, 948 F.3d at 1312. To the extent that companies use smart phone autodialer software to call or message recipients *en masse*, that would be covered.

But the standard, non-automatic message or call would not create TCPA liability. *See id.* at 1317 (Martin, J., concurring in part and dissenting in part) ("[W]hat may have been a reasonable worry in *ACA International* doesn't exist here. Neither situation hypothesized by the majority involves the simultaneous dialing of numbers, plural."). Voice activation software for messaging, like Siri or Alexa, or automatic response messages are not, as the Eleventh Circuit majority assumes, autodialers. *See Glasser*, 948 F.3d at 1309. Voice activation software simply allows a person to dictate the recipient, message, and command to send rather than type the instructions and message. It is not an "automatic" process. And automatic reply messages are only sent *in reply*. Plaintiffs would have a tough go of showing that they did not consent to receiving a message after they themselves initiated contact. At bottom, the Seventh and Eleventh Circuits' "pragmatic" concerns are really a parade of horribles.

### 4. Conclusion

We conclude that it is impossible to draw any reliable conclusion from a plain text reading of the autodialer definition itself and instead rely on the larger context of the autodialer ban. The Eleventh Circuit calls the Ninth Circuit's interpretation "surgery," but as the dissent in *Glasser* points out, "this operation cannot be completed (to either side's satisfaction) without some minimally invasive procedures." *See Glasser*, 948 F.3d at 1318 (Martin, J., concurring in part and dissenting in part). The Seventh and Eleventh Circuits seem to concede that the text of the autodialer definition itself is ambiguous—even if they do not say it directly. They claim to stake their rationale on a plain text reading of the statute. Yet, when it comes to interpreting the word "store," they pivot and play up the administrative history and "practical effects," while downplaying a textual reading of surrounding provisions that would open up a broader application of the autodialer ban.

In the Title VII context, the Supreme Court has rejected the same types of maneuvers that the Seventh and Eleventh Circuits engage in here. *See Bostock*, 2020 WL 3146686, at *9. The Seventh and Eleventh Circuits "retreat beyond the statute's text, where they" emphasize "the legislature's purposes in enacting [the autodialer ban] or certain expectations about its operation. They warn, too, about consequences that might follow a ruling for the [plaintiffs]. But none of these contentions about what the [Seventh and Eleventh Circuits] think the law was meant to do,

or should do, allow us to ignore the law as it is." *See id.* "Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it." *Id.* at *14 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)). "[W]hen the meaning of the statute's terms is plain, our job is at an end." *Id.*

It is our view that related provisions of the autodialer ban are the best guide to the question of how to interpret § 227(a)(1). The consent exception, in particular, commands the plain text reading that the autodialer ban applies to stored-number systems. We accordingly read § 227(a)(1) as follows:

> An ATDS is "equipment which has the capacity—
>
> (A)  to store [telephone numbers to be called];
>
>>  or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B)  to dial such numbers."

§ 227(a)(1). In doing so, we join the Second and Ninth Circuits and hold that a stored-number device like the Avaya system here qualifies as an ATDS. The district court correctly entered judgment in Plaintiffs' favor on this question.

**B. Introduction of Voicemails**

PHEAA additionally argues that Plaintiffs should not be able to recover damages for the thirty voicemails that PHEAA left on Allan's cell phone, asking her to return its call. Plaintiffs did not include these voicemails in their Complaint and did not amend the Complaint to include them. Instead, Plaintiffs introduced the voicemails for the first time on summary judgment. But as the district court noted, these voicemails are associated with calls that were listed in Plaintiffs' Complaint. "In other words, the 30 pre-recorded voicemails were included in the 353 violations and were not alleged as additional violations, only as an alternative theory of recovery." R. 46 (Order Granting Summ. J. at 7) (Page ID #403). The district court properly considered the voicemails.

**III. CONCLUSION**

We hold that PHEAA's Avaya system qualifies as an ATDS and accordingly **AFFIRM** the district court's grant of summary judgment for Plaintiffs.

------------------------

**DISSENT**

------------------------

NALBANDIAN, Circuit Judge, dissenting.  **S**everal courts of appeals and the majority here have discussed at length the meaning of the operative statutory language in this case.  And the Supreme Court will likely address its meaning in the near future.  *See Facebook, Inc. v. Duguid*, No. 19-511, --- S. Ct. ---, 2020 WL 3865252 (July 9, 2020).  I am not going to rehash all of that debate.  Suffice it to say, I disagree with the majority's conclusion here and with much of the analysis from other courts.

Everyone seems to agree that the relevant provision here is not an example of artful drafting.   But I disagree with the majority's determination that the text used to define an automatic telephone dialing system (ATDS), *see* 47 U.S.C. § 227(a)(1), is "ambiguous."  *Ante*, at 9.  While the text may *contain* ambiguity, the text in my view is not "ambiguous"; it does not leave us with an inability to glean the text's meaning from § 227(a)(1) itself.  *Id.*  And I disagree with the interpretation the majority reaches under its methodology.  I accordingly dissent.

Congress defined an automatic telephone dialing system (ATDS) as "equipment which has the capacity [] (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  § 227(a)(1).  Other circuits have examined that text and split in primarily two camps on how to interpret it.  *Compare Duran v. La Boom Disco, Inc.*, 955 F.3d 279 (2d Cir. 2020), *and Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018), *with  Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460 (7th Cir. 2020), *and Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1304–05 (11th Cir. 2020), *and Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018).  Now it's our turn.

The majority summarizes two possible readings of Congress's words before settling on one of the two.  *Ante*, at 6–17.  I'd like to propose a third—"using a random or sequential number generator" modifying the entire phrase "telephone numbers to be called"—that I believe

is the best and correct reading of the statute.**1**   Under my reading of § 227(a)(1), Congress defined an ATDS as "equipment which has the capacity [] (A) to store or produce *telephone numbers to be called, using a random or sequential number generator*; and (B) to dial such numbers." In that case, the modifier describes "a quality of the numbers an ATDS must have the capacity to store or produce[,]" specifically "the process by which those numbers are generated in the first place." *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 938 (N.D. Ill. 2018). I find this reading the best for four reasons.

*First*, this reading is both grammatical and does not require a rewrite of the statute. *See Gadelhak*, 950 F.3d at 466 (describing the majority's reading as "a significant judicial rewrite"); *Glasser*, 948 F.3d at 1311 (describing that reading as "more like 'surgery,' . . . than interpretation"). The noun phrase "telephone numbers to be called" contains both a noun ("telephone numbers") and an adjectival infinitive ("to be called"). The modifier ("using a random or sequential number generator") is a participial phrase—a group of words containing a participle ("a form of the verb") with "modifiers and objects" of its own and that is often set off by commas "follow[ing]" the noun phrases, object, or verb it modifies.**2**   Gordon Loberger & Kate Shoup, *Webster's New World English Grammar Handbook* 214, 368 (2d ed. 2009) (explaining that participial phrases usually serve as adjectives). In this case, the participial phrase modifies the noun phrase "telephone numbers to be called." And this makes sense given

---

**1**There appear to be two other possible readings of the statute—"using a random or sequential number generator" modifying *either* "telephone numbers" or "to be called." *See Gadelhak*, 950 F.3d at 465–66, 67–68. Because I find those options unconvincing, I don't discuss them further.

**2**The Seventh Circuit labeled the modifying phrase as an adverbial phrase before finding that the phrase "cannot modify a noun in this context" ("telephone numbers"). *Gadelhak*, 950 F.3d at 465–66. But that approach here puts the cart before the horse.

A word or phrase could have multiple functions. It's the context in which the writer uses the word or phrase, *e.g.*, placement in a sentence or the sentence's structure, that determines the particular function the word or phrase takes on. *E.g.*, Gordon Loberger & Kate Shoup Welsh, *Webster's New World English Grammar Handbook* 310 (2001) (labeling "due to" as "adjectival in nature" in one sentence while in another as "adverbial"). To classify the function of a word or phrase thus requires the reader to evaluate the manner in which the drafter uses it *before* classifying it. The modifier "using a random or sequential number generator" could function as *either* an adverbial or a participial phrase. To understand the way the drafters used that phrase—as an adverbial or as a participial phrase—a reader has to examine the sentence *and then* classify it.

the modifier's placement—immediately following the noun phrase it modifies.**3**  *See id.* at 102 (explaining "[c]ommon [p]itfalls with . . . [a]djectives" including "locat[ing] [them] in places other than near the words they modify").

*Second*, the effect of this reading—mitigating the superfluity problem with the reading in *Gadelhak* and *Glasser*—supports the superiority of this reading.  It also avoids the superfluity problem—"read[ing] a key clause ('using a random or sequential number generator') out of the statute"—with the majority's reading.  *Glasser*, 948 F.3d at 1307.  True, the general presumption against surplusage, like all other interpretive canons, is merely a presumption that reflects drafters' ordinary practices.  Antonin Scalia & Bryan A. Gardner, *Reading Law: The Interpretation of Legal Texts* 176–79 (2012) ("[L]ike all other canons, th[e] [surplusage] one must be applied with judgment and discretion, and with careful regard to context.  It cannot always be dispositive because (as with most canons) the underlying proposition is not *invariably* true."); *see also* William N. Eskridge, Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 113 (2016) (describing the limitations on the anti-surplusage canon).  But this is not a case where the grammatical reading that avoids superfluity results in "an unusual meaning[,]" Scalia & Garner, *supra*, at 176; it is one that makes good sense.

*Third*, the understanding of the statutory text as reflected in the FCC's orders from 1991 to 2003 confirms my reading of the text.  *See ante*, at 12 (explaining that the FCC's orders from 1991 to 2003 "defined an ATDS as a device that uses a random or sequential number generator"); *see also Glasser*, 948 F.3d at 1308.  Though we do not look to the FCC's orders for guidance on the statutory interpretation question before this court, *see ante*, at 5, those earlier orders provide at least some evidence on the contemporaneous understanding of the statutory text.  *See Glasser*, 948 F.3d at 1308 (invoking the FCC's orders in the same manner to support another interpretation of the statutory text).

---

**3**I believe that the majority misinterprets the reading I propose.  First, it explains "it would be strange to store numbers using a [random] number generator[.]"  *Ante*, at 8–9.  Second, it remarks "it still makes little sense why the statute would require stored numbers to be called using a random or sequential number generator."  *Id.* at 8.  But under the reading I propose, the modifier ("using a random or sequential number generator") has nothing to do with the act of storing numbers and my reading does not require the ATDS *call* numbers "using a random or sequential number generator."  Instead, under my reading, the modifier describes only the *type* (or quality) of telephone number (those generated "using a random or sequential number generator") that the ATDS "store[s] or produce[s]" and then ultimately dials.  So those responses are inapplicable.

*Fourth*, the historical context provides further evidence supporting the meaning laid out by the statutory text. Congress sought to address a very specific problem with this statute— machines that would dial particular numbers in the process of "dialing randomly or sequentially generated telephone numbers—a concern raised in the legislative debates." *Id.* at 1308–11 ("Congress wanted the statute to eradicate machines that dialed randomly or sequentially generated numbers."). "That indeed seems to have been the be-all and end-all of the law." *Id.* at 1311 (citing *H.R. 1304 & 1305, Hearing Before the Subcomm. On Telecomms. & Fin. of the H. Comm. on Energy & Commerce*, 102d Cong. 1 (1991) (statement of Chairman Edward J. Markey)).

There is no obvious answer to the question raised in this case as evidenced by the different approaches used by my learned colleagues from this court and others. But under my understanding of § 227(a)(1), a device like the Avaya system that dials only from a selected stored list of numbers does not qualify as an ATDS. Therefore, I disagree with the majority's decision to affirm the district court's decision granting Plaintiffs summary judgment and accordingly dissent.